John W. Howard (SBN 80200)
**JW HOWARD │ ATTORNEYS, LTD.**
600 West Broadway, Ste. 1400
San Diego, California 92101
Telephone: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff, Steve Hilton

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA (SOUTHERN DIVISION)

| | |
|---|---|
| STEVE HILTON,<br><br>     Plaintiff,<br><br>v.<br><br>SHIRLEY WEBER, in her official capacity as California Secretary of State, GOV. GAVIN NEWSOM in his official capacity,<br><br>     Defendants | Case No.: 8:25-cv-01988-KK-E<br>Hon. Kenly Kiya Kato<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    November 7, 2025<br>Time:    9:30 a.m.<br>Dept.:    Courtroom 3, Third Fl. |
| And the LEGISLATURE OF CALIFORNIA,<br><br>     Real Parties in Interest | [MOTION OPPOSED;<br>ORAL ARGUMENT REQUESTED] |

# TABLE OF CONTENTS

**PAGE**

I.   Introduction ...................................................................………..1

II.  Request for Three-Judge Panel…................................................……...2

III. Factual Background…...........................................................……...2

IV. Argument……….....................................................................…….6

    A. The Purcell Doctrine and Federal Authority to Enjoin Statewide Election

       Measures………......................................................................…….6

    B. This Court Should Grant Plaintiff's Preliminary Injunction………......…..12

       i.        Factor One: Serious Questions on the Merits………….................13

       ii.       Factor Two: Likelihood Of Irreparable Harm…..............…….17

       iii.     Factor Three: Balance Of Hardships Tips Sharply

            In His Favor………...................................................................18

       iv.     Factor Four: Injunction Is In the Public Interest………........….20

V.  Request for Relief………..................................................................21

VI.  Plaintiff is Prepared to Give Security under Rule 65…..........................……...22

VII.  Conclusion……….....................................................................…….22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA  92101

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..........................................................12, 19, 20

*Arizona Dream Act Coalition v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) 19,

*Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*,
    950 F.2d 1401 (9th Cir. 1991)........................................................................19

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ......................................................................................16

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ......................................................................................13

*Elrod v. Burns*,
    427 U.S. 347 (1976) ...................................................................................... 17

*Eu v. San Francisco County Democratic Central Committee*,
    489 U.S. 214 (1989) ......................................................................................10

*Evenwel v. Abbott*,
    578 U.S. ___ (2016) ........................................................................................2

*Feldman v. Arizona Secretary of State's Office*,
    843 F.3d 366 (9th Cir. 2018)............................................................... 8, 9, 10

*Fortson v. Toombs*,
    379 U.S. 621 (1965) ................................................................................10, 11

*Franklin v. Massachusetts*,
    505 U.S. 778 (1992) ......................................................................................13

*Georgia v. Ashcroft*,
    539 U.S. 461 (2003) ..........................................................................10, 15, 16

*Gill v. Whitford*,

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

585 U.S. 48 (2018) ...................................................................................18

*Goldie's Bookstore, Inc. v. Superior Court of California*,

739 F.2d 466 (9th Cir. 1984) .............................................................17

*Gray v. Sanders*,

372 U.S. 368 (1963) ...........................................................................14

*Harris v. Arizona Independent Redistricting Commission*,

578 U.S. 253 (2016) ...........................................................................17

*Imperial Sovereign Court of Montana v. Knudsen*,

684 F. Supp. 3d 1095 (D. Mont. 2023) ..............................................21

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,

803 F.3d 389 (9th Cir. 2015) .............................................................19

*Kirkpatrick v. Preisler*,

394 U.S. 526 (1969) ......................................................................passim

*National Wildlife Federation v. Coston*,

773 F.2d 1513 (9th Cir. 1985) ...........................................................12

*Nken v. Holder*,

556 U.S. 418 (2009) ...........................................................................18

*Purcell v. Gonzalez*,

549 U.S. 1 (2006) ........................................................................... 8-11

*Republic of the Philippines v. Marcos*,

862 F.2d 1355 (9th Cir. 1998) ...........................................................12

*Reynolds v. Sims*,

377 U.S. 533 (1964) ......................................................................passim

*Roman v. Sincock*,

377 U.S. 695 (1964) ...........................................................................17

*Rucho v. Common Cause*,

588 U.S. ___ (2019) ...........................................................................11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*Southwest Voter Registration Education Project v. Shelley*,

    344 F.3d 914 (9th Cir. 2003) (en banc)..........................................................7

*Utah v. Evans*,

    536 U.S. 452 (2002) ..................................................................................13

*Valle del Sol Inc. v. Whiting*,

    732 F.3d 1006 (9th Cir. 2013).....................................................................20

*Vandermost v. Bowen*,

    53 Cal. 4th 421 (2012).................................................................................4

*Vanguard Outdoor, LLC v. City of Los Angeles*,

    648 F.3d 737 (9th Cir. 2011) ......................................................................12

*Wesberry v. Sanders*,

    376 U.S. 1 (1964) ...........................................................................1, 14, 16

*Winter v. Natural Resources Defense Council, Inc.*,

    555 U.S. 7 (2008) ..........................................................................10, 12, 18

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. XXI, § 2 ...............................................................................3

**STATUTES**

28 U.S.C. § 2284 ..........................................................................................3

42 U.S.C. § 1983 ..........................................................................................7

Cal. Gov't Code § 8253 ..............................................................................3, 4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

**RULES**

Fed. R. Civ. P. 65 ..................................................................................23

**OTHER AUTHORITIES**

Proposition 11, Gen. Elec. (Cal. Nov. 4, 2008) .........................................3

Proposition 20, Gen. Elec. (Cal. Nov. 2, 2010) .........................................4

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I.    __Introduction__

Plaintiff, Steve Hilton, like every California voter, has a right to fair and effective elections and the right to have his vote counted equally with the vote of any other person under the Equal Protection Clause enshrined in the U.S. Constitution's Fourteenth Amendment.

He challenges the constitutionality of Proposition 50 on the November 4, 2025 California Statewide ballot on the grounds that it almost certainly guarantees he will be re-mapped into a congressional district that is unequal in population to every other district in California.  If this State action is left unchecked, Plaintiff risks having his vote rendered meaningless through state action that violates the "one person, one vote" principle protected under the Fourteenth Amendment.

The danger to democratic principles and election integrity cannot be overstated. Proposition 50 is a re-mapping of congressional seats which "contracts the value of some votes and expands that of others" and is therefore unconstitutional because it guarantees his vote for Congress will not be given as much weight as any other vote." *Wesberry v. Sanders*, 376 U.S. 1, 14 (1964).

It is antithetical to equal protection principles for a State, through its legislative or initiative powers, to redistrict congressional seats in a way that does not achieve nearly equal population within the districts. *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969).

Worse yet, the State did this quickly and in virtual secret.  The legislature ignored the precedent of the California Citizens Redistricting Commission ("CCRC") to take public input around the State over several weeks.  The legislature introduced this plan, and passed it on a partisan vote, in only three days, in the committee rooms of the State Capitol in Sacramento.

The California Governor and Legislature did not propose this mid-decade re-mapping of congressional seats to achieve any legitimate governmental purpose.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Instead, it presented this plan, openly and brazenly, as an exercise in partisan gerrymandering in response to something that may, or may not happen in other states.

Unless this Court acts, the State will continue to engage in this unconstitutional action through the 2025 campaign and beyond.

## II.    Request for Three-Judge Panel

Because the case challenges the apportionment of congressional districts, Plaintiff requests a three-judge court under 28 U.S.C. § 2284.

## III.    Factual Background

At the start of each decade, the federal government conducts a national census. Beginning on April 1 of the census year, the United States Census Bureau collects population and demographic data for the entire country. 13 U.S.C. § 141 (a).

The 2020 United States census conducted a count of residents of the United States and five U.S. territories. Census results are used to reapportion seats in the U.S House of Representatives and to realign congressional districts.

Within one year of this date, the Census Bureau must deliver this census data to California for the purpose of drawing new districts for the United States Congress, the State Senate, State Assembly, and Board of Equalization ("BoE").

Then, California begins its redistricting process. The goal of redistricting is to craft new district maps that reflect current population numbers, to ensure compliance with the constitutional one-person, one-vote rule. *See Evenwel v. Abbott* (2016) 578 U.S.____ (2016); California Constitution Article XXI, Sec 2 (d)(1).

First, the California Legislature prepares a dataset that combines the federal census data with voter registration data and historical statewide results. Cal. Gov. Code § 8253 (b).

Then, the Legislature provides this data set to the Citizens Redistricting Commission ("the Commission") an independent panel of fourteen Californians of different party affiliations that is tasked with drawing new maps for the

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Congressional, Senate, Assembly, and BOE districts. Cal. Const. Art XXI, § 2.

The Commission was first created with the passage of Proposition 11 in 2008, which transferred the power to draw Senate, Assembly, and BOE maps from the Legislature to the newly formed Commission.

In 2010, California voters passed Proposition 20, which expanded the Commission's responsibilities to include drawing the Congressional maps.

Under the California Constitution, as amended by these two initiatives, the Commission must conduct an "open and transparent redistricting process" that allows a public comment on draft maps produced by the commission. Cal. Const. Art XXI, § 2 (b); Cal. Gov. Code § 8253. This "open and transparent" work includes arranging public hearings and soliciting public participation.

The Commission must release at least one set of draft maps for public comment by July 1st of the year following the census year. The public has at least 14 days to give public comment on these publicly displayed draft maps. Cal. Gov. Code § 8253 (a)(7).

The Commission may consider these public comments, but they must approve and certify the final maps by August 15th, thus creating a 45-day public "comment and review" period. Cal. Const. Art XXI, § 2 (g).

Upon commission approval, the Commission shall certify the four final maps to the Secretary of State.

If the Commission does not approve a final map by the requisite votes, or if voters disapprove a map in a referendum election, the California Constitution provides that the Secretary of State "shall immediately petition the California Supreme Court for an order directing the appointment of special masters" to adjust district boundaries using the census data. Cal. Const. art. XXI, § 2(j). At that point, the Court becomes responsible for approving and certifying the special masters' map to the Secretary of State. *Id*.; *see also Id*., § 3(b)(1).

In 2011, the Commission followed the California Constitution and conducted an

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

"open and transparent" redistricting process. For example, during the 2011 period, the redistricting process included "more than 70 business meetings and 34 public hearings in 32 cities throughout the state." *Vandermost v. Bowen* (2012) 53 Cal.4th 421, 445. These hearings were scheduled in a manner that made it convenient for "average citizens" to participate, and the public was "regularly allowed" to provide "input and comment." *Vandermost* at 445. Educational materials were distributed in seven different languages, and the redistricting process included the consideration "in addition to oral testimony, more than 2,000 written submissions" and "written comments, input and suggestions from more than 20,000 individuals and groups." *Id*. at pp. 445–446.

Before these 2011 draft maps were issued, the redistricting process included twenty-three "public input hearings," and after draft maps were released there was a five-day review period followed by an additional eleven hearings "to collect reactions to and comments concerning those draft maps." *Id*.  Public meetings were live-streamed, captured on video, and placed on the Commission's Web site for public viewing. *Id.* Every document created in the redistricting process was posted on the internet. *Id.*

It's important to note that 2011 provides a better template than 2021 for public input because in 2021 the Commission's redistricting efforts, and public input, were impacted by the delayed timing of the federal census that occurred because of the COVID-19 pandemic in 2020. *See Legislature v. Padilla* (2020) 9 Cal.5th 867, 873.

Under the California Constitution, the CCRC has exclusive authority to adjust congressional and legislative district boundaries once every decade, in the year following the national census. Cal Const., Art. XXI, Sec 1. The CCRC consists of 14-members, including five Republicans, five Democrats, and four members not affiliated with either party. CA Const. Art. XXI, Sec. 2(c)(2). The CCRC must draw district lines in conformity with strict, nonpartisan rules designed to create districts of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

relatively equal population that "respect the geographical integrity" of local communities of interest which "share" common social and economic interests, thereby "encouraging geographical compactness" to provide fair representation for all Californians. CA Const. Art. XXI, Sec. 2(d)(1)-(6).

On August 14, 2025, Governor Gavin Newsom announced plan to introduce a legislative package for a state constitutional amendment to allow the Legislature to redraw the boundaries of California's congressional districts before the decennial federal census in 2030.

On August 18, 2025, the Legislature "gut and amended" ACA 8 to request a change in the California Constitution to bypass the Citizens Redistricting Commission and authorize the use of 52 new congressional maps in the 2026, 2028, and 2030 congressional elections until they are replaced by the Citizen Redistricting Commission process following the 2030 census.  ACA 8 did not propose any change in the current maps for the State Senate, State Assembly, or State Board of equalization. A true and correct copy of the final version of ACA 8 is attached hereto as **Exhibit "A"**.

On August 18, 2025, The Legislature also "gut and amended" SB 604 to create the new maps. The bill is more than a hundred pages of census tract numbers that were used to create the new maps so will not burden the court with a pdf copy, however you can find it online at:

https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202520260AB604

The Legislature also "gut and amended" SB 280 at the same time to call for a special election on November 4, 2025. A true and correct copy of SB 280, as amended on August 18, is attached hereto as Exhibit 5.

On August 21, 2025, ACA8 and AB 604 and SB 280 were each passed as "emergency legislation" by two-thirds votes in the California Assembly and State Senate.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

On August 22, 2025, Governor Gavin Newsom signed AB 604 and SB 280 into law and ACA 8 was enrolled and filed with the Secretary of State.

Proposition 50 is a mash-up of these three bills. It is the requested change to the constitutional authority (ACA 8) and the new congressional maps (AB 604) placed on the ballot in a special statewide election. SB 280. The stated purpose of Proposition 50 is partisan gerrymandering.

Proposition 50 will be voted on November 4, 2025, in this statewide special election. It is the only item that will appear on this statewide ballot.

On April 23, 2025, Steve Hilton, a resident and registered voter in San Mateo County, California, announced his candidacy for the 2026 California Governor race.

On September 4, 2025, Mr. Hilton filed a complaint for civil rights violation, declaratory relief, and injunctive relief in the United States District Court, Central District of California. Case No. 8:25-cv-01988-KK-E. The complaint names Governor Newsom and Secretary of State Weber as Defendants in their official capacity. Complaint, p.1. The complaint alleges that these State executive elected officials, along with the California Legislature, violated Mr. Hilton's Equal Protection rights under 42 U.S.C. § 1983 by creating unequal congressional districts.

Mr. Hilton resides in proposed new congressional district 15 in California that will be re-mapped as part of Proposition 50's redistricting plan. Furthermore, as his campaign touches on every congressional district within the state of California, Mr. Hilton will be subject to a "hyper-partisan gerrymandering project undertaken by [Governor Newsom] and the [state] legislature," which abridges the equal protection rights of Mr. Hilton and all California residents.

## IV. __Argument__

### A. __The Purcell Doctrine and Federal Authority to Enjoin Statewide Election Measures__

Federal courts have evaluated the issuance of injunctions in cases involving

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

statewide elections, particularly when the matter concerns an alleged constitutional violation under the Fourteenth Amendment. For example, in *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 920 (9th Cir. 2003) (en banc), the Court affirmed the District Court's denial of a preliminary injunction that would have stopped voters from using punch-card balloting machines.

The plaintiffs claimed that their right to equal protection was violated because voters in counties that use punch-card machines would have a comparatively less chance of having their votes counted than voters in counties that use other technologies. *Id*. at 917. A three-judge panel analyzed the merits of the equal protection claim and concluded that the plaintiffs had shown a substantial likelihood of success, but after balancing the harm to each party and the public interest, the panel reversed the District Court's denial of the injunction. *Id.*

In reviewing the record, the Court of Appeals pointed out that California voters were scheduled to decide on a proposed recall of the Governor, and, if so, who should replace him. *Id.* at 916. Voters were also asked to consider two statewide initiatives, including a proposed constitutional amendment sponsored by the state legislature. *Id*. The Court of Appeals showed particular interest in how the injunction would affect the recall election, noting the significant investment of time and money that state officials, candidates, and campaigns had spent preparing for the election, and the outcome would have an immediate effect. *Id.* at 919. Importantly, the court noted that "hundreds of thousands of absentee voters had[d] already cast their vote" based upon the election timetable set by the state. *Id.* For these reasons, the Court of Appeals concluded that the public interest was significantly affected by halting a statewide election and thus held that the District Court had not abused its discretion in deny the plaintiffs' injunctive relief request. *Id.* at 920.

Following the *Shelley* decision, the United States Supreme Court vacated an injunction entered by a two-judge motions panel of the Ninth Circuit of Appeals

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

enjoining use of Arizona's voter identification procedures. *Purcell v. Gonzalez*, 549 U.S. 1, 2 (2006). The *Purcell* court determined that the Court of Appeals could not conduct a proper evaluation of the requested relief because the District Court denied the plaintiffs' request for a preliminary injunction, without issuing required findings of fact or conclusions of law. *Id.* at 5.

Moreover, the *Purcell* court expressed concern that the lower courts were adjudicating the injunctive relief within weeks of the election. *Id.* at 3-4. The *Purcell* court reasoned that "[c]ourt orders affecting elections…can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk increases." *Id.*, at 4-5. Thus, the *Purcell* court concluded that "[g]iven the imminence of the election and the inadequate time to resolve the factual disputes, [out] of necessity…the election [will] proceed without an injunction suspending the voter identification rules." *Id.* at 6. (cleaned up.)

The Ninth Circuit again reviewed an elections-related injunction in *Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366 (9th Cir. 2018). The Court noted that "we do not lightly interfere with…a state election." *Id.* at 368 (quoting *Shelley*, 344 F.3d at 918). Yet this time the Courts of Appeals granted the plaintiffs' motion for an injunction pending appeal. *Id.* at 367.

In applying the *Purcell* principles, the *Feldman* court recognized that federal courts must "weigh, in addition to the harms attendant upon issuance of nonissuance of an injunction, considerations specific to election cases." *Id.* at 368 (quoting *Purcell*, 549 U.S. at 4). The *Feldman* court emphasized that the *Purcell* court "did not set forth a per se prohibition against enjoining voting laws on the eve of an election. Rather, courts must assess the particular circumstances of each case in light of the concerns expressed by the *Purcell* court to determine whether an injunction is proper." *Id.*, citing *Purcell*, 549 U.S. at 4.

The *Feldman* court determined that the plaintiff's preliminary injunction

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1   request "[did] not affect the state's election process or machinery." *Id.* at 368.

2   Likewise, in this case, Plaintiff's injunctive relief request does not affect the elections

3   process. Proposition 50 proposes to amend California's congressional districts. So,

4   unlike the circumstances involved in *Purcell* (voter identification that changed who

5   was eligible to vote) and *Shelley* (use of punch-card balloting machines), the

6   injunction at issue here is similar to the one in *Feldman* in so much as it does not

7   involve any change to the actual elections process within California.

8       Further, the *Feldman* court addressed the concerns in *Purcell* and *Shelley* that

9   "a federal court injunction would disrupt long standing state procedures." *Id.* at 368-

10  69. The Court distinguished those situations because the injunction at issue in

11  *Feldman* preserved the *status quo* prior to the legislative action. *Id.* at 369. Likewise,

12  Plaintiff's injunctive relief request would preserve the *status quo* prior to Proposition

13  50 by restoring the CCRC's congressional redistricting authority and preventing the

14  use of the proposed map which, as detailed below, violates the Fourteenth

15  Amendment's Equal Protection Clause.

16      The *Feldman* court also determined that unlike the *Purcell* plaintiff, the

17  *Feldman* plaintiff did not delay in filing a complaint and requesting an injunction. *Id.*

18  at 369. Here, Plaintiff filed his complaint and requested relief with this Court on

19  September 4, 2025 – approximately ten days after Governor Newsom signed the

20  legislation underlying Proposition 50. Thus, Plaintiff has not caused undue delay in

21  the proceedings.

22      The *Feldman* court further distinguished *Purcell* because unlike the lower

23  courts there, the District Court had given "careful and thorough consideration" to

24  plaintiff Feldman's request for injunctive relief. *Id.* at 369-70. As the *Feldman* court

25  observed, "*Purcell* involved a barebones order issued by a two judge motions panel,

26  which did not contain a reasoned decision." *Id.* at 369 (citing *Purcell*, 549 U.S. at 5).

27  Similarly, Plaintiff's request in this case affords the opportunity for this Court to avoid

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

the situation in *Purcell* altogether by carefully and thoroughly considering the facts and *Winters* factors, as articulated below, and issuing an injunction regarding the November 4, 2025 special election.

Federal courts generally avoid interfering in state election matters under the "*Purcell* principle," which discourages changing election rules close to an election. *Purcell,* 549 U.S. at 4-5. Nevertheless, federal courts may enjoin a state from holding a vote on a contested proposition when it violates the U.S. Constitution or federal law. *See, e.g., Feldman*, 843 F.3d 366. "[A] State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). And "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. As it stands, elections are typically expensive in terms of government time, money, and resources.

But more is at stake here. Putting forth a ballot measure such as Proposition 50, that violates the Fourteenth Amendment's Equal Protection Clause by "den[y]ing by a debasement or dilution of the weight of a citizen's vote," would effectively chip away at voters' confidence in the democratic process and breed distrust in our government. *Reynolds*, 377 U.S. at 555.

In *Fortson v. Toombs*, 379 U.S. 621, 622 (1965) (per curiam), the Supreme Court reviewed an order issued by a three-judge District Court that enjoined the Georgia Secretary of State from placing on the ballot a state constitutional amendment proposed by the General Assembly.

Because the District Court held that the House of Representatives of the General Assembly was unconstitutionally composed, the order enjoined the submission of the proposed constitutional amendment to the voters *until the General Assembly was properly apportioned. Id.* at 622. The *Fortson* Court did not reach the merits regarding the propriety of the district court's order. Instead, as Justice Clark

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

succinctly noted in his concurring opinion, the Court simply "vacat[ed] and remand[ed] in order to give the District Court an opportunity to reconsider its order in light of the change in circumstances which has occurred since judgment was entered." *Id.* at 623. Thus, just as a legislatively proposed state constitutional amendment was enjoined by the District Court in *Fortson*, this Court should enjoin Proposition 50 from going before the California voters, at the very least until the alleged malapportioned congressional redistricting is cured to comply with *Reynolds*' "one person, one vote" constitutional standard.

If the Legislature had merely proposed to amend the California Constitution to change how congressional districts are drawn, then such a proposal would not violate the fundamental political equality concept of "one person, one vote" guaranteed under the equal protection clause. *Reynolds*, 377 U.S. at 555; *Kirkpatrick*, 394 U.S. at 531; *Rucho*, 588 U.S. at 709. That is not what the Legislature did here; instead, it also incorporated into Proposition 50 the impermissible congressional districting map itself. Yet the Legislature failed to account for massive population reductions in large parts of California, such as Pacific Palisades, Malibu, and Altadena, which were impacted by the devastating fires that displaced tens of thousands of residents. Complaint, para. 11.

Equal representation is a paramount public interest. And the public interest can never be served by constitutional violations. Further, unlike the subject matter of the contested injunctions in *Purcell* (voter ID law) and *Shelley* (pre-scored, punch-card balloting machines), Proposition 50 would not interfere with the way voters cast their ballots. Indeed, votes have yet to be cast on Proposition 50, further reducing the likelihood of voter disenfranchisement or confusion that was of concern in *Purcell* and *Shelley*. And the upcoming special election involves one legislatively proposed matter (Proposition 50), whereas *Shelley* involved three ballot measures (Governor recall and two initiatives). Importantly, unlike in *Shelley*, there are no candidates involved.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

**B. This Court Should Grant Plaintiff's Preliminary Injunction**

Ordinarily, to obtain a preliminary injunction, the moving party must establish that (1) he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

When the potential hardships are more dangerous, the Ninth Circuit will use a different standard to grant preliminary injunctive relief. It requires the moving party to establish that (1) he has raised "serious questions going to the merits", (2) that there is a likelihood of irreparable harm, (3) the balance of hardships tips sharply in his favor, (4) and an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

In both standards, all four prongs of this "sliding scale" test must be met, but "a stronger showing in one element may offset a weaker showing of another." *Vanguard Outdoor, LLC v. City of Los Angeles*, 648 F.3d 737, 739 (9th Cir. 2011).

The "Serious Questions" standard only requires the moving party to raise "a serious question" going to the merits because it requires a stronger showing of the hardships.

For the purposes of injunctive relief, "serious questions" refers to questions which cannot be resolved one way or the other at the hearing on the injunction as to which the court perceives a need to preserve the status quo lest one side prevent resolutions or execution of any judgment by altering the status quo. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1998) (en banc).

"Serious questions" need not promise a certainty for success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *National Wildlife Federation v. Coston*, 773 F.2d 1513, 1517 (9th Cir 1985).

Given the important interests this motion affects, and the grave implications of

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

12

this case, Plaintiff urges the Court to apply the "Serious Questions" standard, but Plaintiff's case can satisfy either test.

### i.      Factor One: Serious Questions on the Merits

This preliminary injunction should be granted because there are "Serious concerns" that Proposition 50 maps reflect unequal congressional districts, and therefore the State's action deny Plaintiff, and everyone else in the state, the right to an equal vote in congressional elections.

The state's failure to use accurate current data to draw congressional districts of nearly equal population raises serious questions about the redistricting plan under Proposition 50.

The U.S. Constitution, to apportion Members of the House of Representatives among the States, requires an "Enumeration" of the population every 10 years, to be made "in such manner" as Congress "shall by Law direct." Art. I, §2, cl. 3; Amdt. 14, §2.

The population count derived from the census is used not only to apportion representatives but also to allocate federal funds to the States and to draw electoral districts. *Dep't of Commerce v. New York*, 588 U.S. 752 (2019).

Our nation has a "strong constitutional interest in accuracy" in the census. *Utah v. Evans*, 536 U.S. 452, 478 (2002). The Census Act imposes a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment. *Franklin v. Massachusetts*, 505 U.S. 778, 819–20 (1992).

It's common sense that after five years, the 2020 census numbers are no longer "accurate." People leave California every day for other states. Large communities in the Los Angeles area, such as Pacific Palisades, Malibu, and Altadena, experienced massive reductions in population as a result of the January 2025 devastating fires that displaced tens of thousands of residences. (Complaint, para. 11.)

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

13

Even though a congressional districting plan will usually be in effect for at least 10 years and five congressional elections, "situations may arise where substantial population shifts over such a period can be anticipated." *Kirkpatrick v. Preisler*, 394 U.S. 526, 535 (1969).

The Legislature "did not use, or did not have, current data, to ensure that California's congressional districts are "nearly equal in population." (Complaint, p. 8.) These unequal population districts create "serious questions" about Proposition 50's constitutionality.

In 1963, the United States Supreme Court interpreted the Constitution to require that electoral districts within a redistricting map contain an approximately equal number of persons. This requirement is referred to as the equality standard or the principle of one person, one vote. *Gray v. Sanders*, 372 U.S. 368, 381 (1963).

In 1964, the Supreme Court interpreted provisions of the Constitution to require that, as nearly as is practicable, one person's vote in a congressional election is to be worth as much as another's. *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).

Later in 1964, the Court extended the equality standard to apply to state legislative redistricting under the Equal Protection Clause, requiring all participants in an election to have an equal vote. *Reynolds v. Sims*, 377 U. S. 533 (1964).

The Fourteenth Amendment's Equal Protection Clause requires States to "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable," *Reynolds v. Sims*, 377 U. S. 533. What's equal? For Congressional districts, Courts require congressional districts within a state to be nearly identical in population. Acceptable deviations are very small—often just a few individuals—and must be justified by a specific, legitimate state objective.  A larger deviation, even under 1%, places a greater burden on the state to prove its legitimate objectives and show that it couldn't achieve them while obtaining greater population equality.

Even if some are the districts are within 1% deviation, that still does not justify

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

their use unless they can establish legitimate state objective, and no court has said that purely partisan redistricting is a "legitimate state objective that would justify violating a plaintiff's equal protection rights that come from the one-person-one vote rule.

In *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969) the Court invalidated an apportionment of Missouri's congressional districts with a maximum deviation of 5.97 percent, rejecting the State's attempted justifications as being "ad hoc," "haphazard," and not applied in a systemic, uniform manner throughout the State. *Id*. at. 535. The Court rejected Missouri's arguments that variances were "a means to "minimize the opportunities for partisan gerrymandering." *Id.* at 533-34. The Court concluded that "problems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster." *Id*. at 533.

The California Governor and Legislature ignored traditional districting principles, and developed an ad hoc solution in response to proposed partisan congressional redistricting plans in other states. In doing so, they took arbitrary action and abandoned the "honest and good faith effort" standard to fashion roughly equal population within congressional districts, *Reynolds*, 377 U.S. at 577, in favor of intentionally disadvantaging political opponents and diluting voting power of Californians who reside in every district across the State.

The state will argue they used the 2020 census data and therefore the best census data available to draw the maps, but everyone knows, including the Governor and every member of the legislature, that those maps cannot be accurate within one vote as required by redistricting law.

However, the right to use old census information is suspect, and even the use of five year-old census information is considered a "legal fiction" As the Supreme Court said in *Georgia v. Ashcroft*:

When the decennial census numbers are released, States must redistrict to account for any changes or shifts in population. But before the new census, States

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

15

1  operate under the legal fiction that even 10 years later, the plans are constitutionally

2  apportioned. After the new enumeration, no districting plan is likely to be legally

3  enforceable if challenged, given the shifts and changes in a population over 10 years.

4  And if the State has not redistricted in response to the new census figures, a federal

5  court will ensure that the districts comply with the one-person, one-vote mandate

6  before the next election. *Georgia v. Ashcroft*, 539 U.S. 461 (2003) fn 2.

7       There are "Serious Questions" about the constitutionality of Proposition 50

8  because it is risking the equal protection rights of California citizens based on a five

9  year old "legal fiction" for the purpose of partisan gerrymandering.

10       The state has produced zero evidence in the legislative history or ballot

11  statements for Prop 50 that it has clear and convincing evidence that these maps are

12  relatively equal in population or if unequal, that the discrepancy serves a legitimate

13  governmental purpose.

14       The Supreme Court held that one person's vote in a congressional election is to

15  be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964).

16       Accordingly, the Court recognized that equal representation for equal numbers

17  of people (is) the fundamental goal for the House of Representatives. To achieve fair

18  and equal apportionment across the States, the Court ruled that congressional districts

19  must be "as nearly as practicable" equal in population; unjustified deviations violate

20  equal protection. *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-531 (1969).

21       The Fourteenth Amendment's Equal Protection Clause provides that: "No State

22  shall deny to any person within its jurisdiction the equal protection of the laws." U.S.

23  Const. Amend XIV. It is axiomatic that the fundamental right to vote is protected

24  under the Fourteenth Amendment. See *Reynolds*, 37 U.S. at 554 ("Undeniably the

25  Constitution of the United States protects the right of all qualified citizens to vote, in

26  state as well as federal elections."); See also *Burdick v. Takushi*, 504 U.S. 428, 433

27  ("It is beyond cavil that voting is of the most fundamental significance under our

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1  constitutional structure.").

2      In *Reynolds*, the Supreme Court recognized that the Fourteenth Amendment

3  "guarantees the opportunity for equal participation by all voters in the election" of

4  legislators. *Reynolds*, 377 U.S. at 566. And that opportunity "can be denied by a

5  debasement or dilution of the weight of a citizen's vote just as effectively as by

6  wholly prohibiting the free exercise of the franchise." *Id.* at 555.

7      The Reynolds court thus concluded that a State cannot "dilute the weight of

8  votes because of place of residence." *Id.* at 566. Instead, States must, to the extent

9  possible, draw congressional districts that are roughly equal in population. *Id.* at 577;

10 *see also Harris v. Arizona Independent Redistricting Com'n*, 578 U.S. 253, 258

11 (2016) (The "Fourteenth Amendment's Equal Protection Clause requires States to

12 "make an honest and good faith effort to construct [congressional] districts…as nearly

13 of equal population as is practicable.").

14     Under the Equal Protection Clause, a State must make an honest and good faith

15 effort to construct congressional districts as nearly of equal population as is

16 practicable. *Reynolds*, 377 U.S. at 577. To avoid malapportionment, a state policy

17 must be applied in a manner "free from any taint of arbitrariness or discrimination."

18 *Roman v. Sincock*, 377 U.S. 695, 710 (1964).

19     Plaintiff has raised "serious questions" that he be forced into a congressional

20 district that has become unequal because it's based on old population data. This

21 violates his Constitutional Equal Protection right to have his vote count the same as

22 others under the one-person one-vote rule and thereby violates his constitutional right

23 to equal protection under the law.

24     **ii.    <u>Factor Two: Likelihood Of Irreparable Harm</u>**

25     It is well established that the deprivation of a constitutional right

26 "unquestionably constitutes irreparable injury.'" *Elrod v. Burns*, 427 U.S. 347, 373

27 (1976); s*ee also Goldie's Bookstore, Inc. v. Superior Court of California*, 739 F.2d

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."); *see also Associated Gen. Contractors of Cal., Inc. v. Coalition of Econ. Equity*, 950 F.2d 1401, 1402 (9th Cir. 1991 ("An alleged constitutional infringement will often alone constitute irreparable harm.")  When the government is a party, these two *Winter* factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A person's right to vote, moreover, is "individual and personal in nature." *Gill v. Whitford*, 585 U.S. 48, 65-66 (2018) (quoting *Reynolds*, 377 U.S. at 561.) The *Gill* court explained that when plaintiffs' alleged harm is the dissolution of their vote, that injury is district specific based upon the "boundaries of the particular district in which they reside." Gill, 585 U.S. at 66. Here, the significant population fluctuation in large communities, including where Plaintiff resides, underscores likely malapportionment of congressional seats if district lines were drawn without updated data across the State. Plaintiff will be re-mapped into a congressional district that will likely be un-equal in population to other districts under Proposition 50's redistricting plan. (Complaint, p. 4.)

Furthermore, it's clear these new maps are drawn for purely partisan purposes. Thus, as in *Gill*, the Plaintiff claims a constitutional right to not be placed in congressional districts deliberately designed to "waste" his votes in elections where his chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking.)" *Gill*, 585 U.S. at 66.

Because the Complaint raises serious questions as to the constitutionality of Proposition 50 and its deprivation of his constitutional rights to Equal protection under the law.  Therefore, this Court should find that Plaintiff has established a likelihood of irreparable harm.

### iii.   Factor Three: Balance Of Hardships Tips Sharply In His Favor

Under the third factor of the "Serious Questions" standards for a preliminary

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

injunction, the Plaintiff must demonstrate that the balance of hardships tips sharply in his favor. *Cottrell*, 632 F.3d at 1135.

The relevant interests in such an inquiry are those of the parties to the action – the Plaintiff on the one hand and state officials on the other. See *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 412 (9th Cir. 2015) (finding that the inquiry under the balance of hardship factor only concerns the parties to an action).

Here, the balance of equities favors preventing the violation of Plaintiff's constitutional rights." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

If an injunction is not put in place, Prop 50's unconstitutional redistricting scheme will be presented to California voters for approval in the November 2025 special election. If approved by the voters, and not enjoined by the court, it will re-map every congressional district in California for the next three congressional elections. As discussed above, these new flawed districts, including Plaintiff's, will almost assuredly be in violation of the one-person one-vote rule.

If, however, an injunction is filed, Defendants would suffer no harm other than the loss of time and effort to attempt to produce clear and convincing evidence that these maps are relatively equal in population or if unequal, the discrepancy serves a legitimate governmental purpose.

Significantly, the CCRC would retain its authority to redistrict and reapportion congressional seats following the 2030 U.S. Census in accordance with the California Constitution.

Though the Defendants will be delayed while the Court considers the merits of Plaintiff's claims, a relatively short delay will not prejudice the State's efforts in executing the Proposition 50 voting process, or in the alternative, if the Court prefers to wait for the outcome, before enjoining the implementation of the maps. In either case, the State will only be delayed the time it takes to produce clear and convincing

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

evidence that these maps are relatively equal in population or if unequal, that the discrepancy serves a legitimate governmental purpose.

But, if a preliminary injunction is not granted, Plaintiff's equal protection rights would be violated. Thus, the balance of hardships tips sharply in Plaintiff's favor.

### iv.    Factor Four: Injunction Is In the Public Interest

Finally, the Plaintiff must establish that an injunction is in the public interest. *See Cottrell*, 632 F.3d at 1135.

On one side, Governor Newsom wants to redraw California's congressional districts to counter the effects of redistricting efforts of Republican-led states, like Texas. Governor Newsom's intentions are not to serve the public at large, but his political party. On the other side, an injunction to delay the implementation of Prop 50 serves every voter in California, regardless of party. It even protects the future voters who will be of voting age for the 2028 and 2030 elections.

Proposition 50, if passed and not enjoined, will dilute every California's voting power by creating congressional districts that do not comply with the "one-person, one-vote" principle because they are not comprised of roughly equal population based on any accurate and current data. Fixing this problem as soon as possible benefits the public interest.

It is not in the public interest for a potentially unconstitutional re-mapping to remain in effect. The Ninth Circuit has repeatedly stated that "it is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle Del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

There is a public interest in issuing injunctive relief as soon as possible because the cost of holding a special election involving an alleged impermissible congressional redistricting plan is considerably high not only on a constitutional level (equal protection) but also a practical level (budget heavy, resource intensive).

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

"Constitutional violations never serve the public interest." *Imperial Sovereign Court of Montana v. Knudsen*, 684 F.Supp. 1095, 1108 (D. Mont. July 28, 2023). Therefore, the Court should conclude that the public interest factor strongly weighs in favor of the Plaintiff for purposes of a preliminary injunction.

The requested alternative injunctions are narrowly tailored and enforceable. In either option, the status quo is protected until the state can produce clear and convincing evidence that they have properly mapped the state under constitutionally accepted rules. The post-election alternative hinders very few government officials. The pre-election alternative hinders only those involved in receiving and counting the ballots.

### V. Request for Relief

This Court should grant Mr. Hilton's injunctive relief request because

  a. Plaintiff is likely to succeed on the merits, and Proposition 50 raises serious questions regarding the constitutionality of advancing a partisan to create un-equal congressional districts, contravene the well-established process for redrawing congressional districts; and

  b. In the absence of a preliminary injunction, Plaintiff is likely to suffer irreparable harm because his congressional district will be remapped in a manner that does not comply with the "one person, one vote" rule of the U.S. Constitution's Equal Protection Clause; and

  c. The need to preserve congressional districts that meet this constitutional standard without partisan gerrymandering tips the balance of equities in Plaintiff's favor; and

  d. An injunction is in the public interest to preserve the integrity of elections by preventing premature redrawing of congressional districts that do not reflect current population data and therefore do not comply with the "one person, one vote" rule of the Equal Protection Clause.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Therefore, Plaintiff asks for two different and alternative requests for preliminary injunction. Either:

(1) (Pre-election Relief) Direct the Secretary of State to suspend all activity in processing this election and postpone this election until she can produce clear and convincing evidence that these maps are relatively equal in population or if unequal, that the discrepancy serves a legitimate governmental purpose,

or in the alternative:

(2) (Post-election Relief) Wait for the outcome of Proposition 50, and if the measure is passed on November 4, 2025, the court should enjoin immediately the implementation of the new maps until the state can produce clear and convincing evidence that these maps are relatively equal in population or if unequal, that the discrepancy serves a legitimate governmental purpose.

## VI.    **Plaintiff is Prepared to Give Security under Rule 65**

Rule 65 provides that a preliminary injunction may only be granted if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. (FRCP Rule 65(c).)  Assuming the Court intends to grant the preliminary injunction, Plaintiff will defer to the Court as to the proper amount of security to comply with Rule 65.

## VII.   **Conclusion**

Plaintiff requests that the Court grant the instant motion for preliminary injunction and grant the relief sought herein as is set forth above.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

DATED:  October 3, 2025        **JW HOWARD │ ATTORNEYS, LTD.**


By:  */s/ John W. Howard*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
     John W. Howard

     Attorney for Plaintiff, Steve Hilton

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Steve Hilton, certified that this brief contains 6,787words which complies with the word limit of L.R. 11-6.1

DATED:  October 3, 2025          **JW HOWARD │ATTORNEYS, LTD.**


By:  */s/ John W. Howard*
_____
John W. Howard

Attorney for Plaintiff, Steve Hilton

1

2

## CERTIFICATE OF SERVICE

3

4    At the time of service, I was over 18 years of age and not a party to this

5    action. I am employed by JW Howard/Attorneys, LTD. in the County of San

6    Diego, State of California. My business address is 600 West Broadway, Suite

     1400, San Diego, California 92101.

7

8    On October 3, 2025, I electronically filed the **MEMORANDUM OF POINTS**

9    **AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR**

     **PRELIMINARY INJUNCTION.**

10

11    and served the documents using the Court's Electronic CM/ECF Service which

12    will send electronic notification of such filing to all registered counsel.

13

14    I declare under penalty of perjury under the laws of the United States of

15    America that the foregoing is true and correct.  Executed on October 3, 2025 at San

     Diego, California.

16

17    _____/s/ Dayna Dang_____

18    Dayna Dang, Paralegal
      dayna@jwhowardattorneys.com

19

20

21

22

23

24

25

26

27

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# EXHIBIT "A"




| | |
|---|---|
| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

**ACA-8 Congressional redistricting.** (2025-2026)

SHARE THIS: 

### Assembly Constitutional Amendment No. 8

### CHAPTER 156

A resolution to propose to the people of the State of California an amendment to the Constitution of the State, by adding Section 4 to Article XXI thereof, relating to redistricting.

[ Filed with Secretary of State  August 21, 2025. ]

### LEGISLATIVE COUNSEL'S DIGEST

ACA 8, Rivas. Congressional redistricting.

The California Constitution establishes the Citizens Redistricting Commission, which is required to adjust the boundary lines of congressional, Senate, Assembly, and State Board of Equalization districts in the year following the year in which the national census is taken at the beginning of each decade.

This measure, which would include a legislative finding that it is in response to redistricting in Texas in 2025, would, notwithstanding the authority of the Citizens Redistricting Commission, require the state to temporarily use the congressional districts reflected in AB 604 of the 2025–26 Regular Session for every congressional election until the new congressional boundary lines are drawn by the commission in 2031.

Vote: 2/3   Appropriation: no   Fiscal Committee: yes   Local Program: no

Resolved by the Assembly, the Senate concurring, That the Legislature of the State of California at its 2025–26 Regular Session, commencing on the second day of December 2024, two-thirds of the membership of each house concurring, hereby proposes to the people of the State of California that the Constitution of the State be amended as follows:

**First—** This measure shall be known, and may be cited, as the "Election Rigging Response Act."

**Second—** The people of the State of California find and declare all of the following:

(a) President Donald Trump has called on Republican-led states to undertake an unprecedented mid-decade redistricting of congressional seats to rig the 2026 United States midterm elections before voting begins.

(b) The State of Texas has convened a special session of its Legislature to redraw congressional district maps to unfairly advantage Republicans.

(c) The Legislature of the State of Florida has established a select committee to advance an extraordinary mid-decade redistricting to unfairly advantage Republicans.

(d) Republicans have urged the State of Ohio to conduct its mid-decade redistricting to unfairly produce more Republican seats in Congress.

(e) Republican officials in the States of Indiana, Missouri, New Hampshire, Nebraska, and South Carolina are also considering President Trump's call for the mid-decade redistricting of congressional seats to unfairly advantage Republicans.

(f) President Trump and Republicans are attempting to gain enough seats through redistricting to rig the outcome of the 2026 United States midterm elections regardless of how the people vote.

(g) President Trump's election-rigging scheme is an emergency for our democracy.

(h) The 2026 United States midterm elections are voters' only chance to provide an essential check and balance against President Trump's dangerous agenda.

(i) California has long stood as a national leader for fair, independent, and nonpartisan redistricting.

(j) California calls on all other states to commit to fair and impartial drawing of maps.

(k) California has a duty to defend democracy.

(l) The 2026 United States midterm elections for Congress must be conducted on a level playing field without an extreme and unfair advantage for Republicans.

(m) The people of California, not politicians, should have the power to approve temporary congressional district maps in response to President Trump's election-rigging scheme.

(n) It is the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities.

**Third—** That Section 4 is added to Article XXI thereof, to read:

**SEC. 4.** (a) It is the policy of the State of California to support the use of fair, independent, and nonpartisan redistricting commissions nationwide. The people of the State of California call on the Congress of the United States to pass federal legislation and propose an amendment of the United States Constitution to require the use of fair, independent, and nonpartisan redistricting commissions nationwide.

(b) In response to the congressional redistricting in Texas in 2025, and notwithstanding any other provision of this Constitution or existing law, the single-member districts for Congress reflected in Assembly Bill 604 of the 2025–26 Regular Session pursuant to the requirements of Chapter 5 (commencing with Section 21400) of Division 21 of the Elections Code shall temporarily be used for every congressional election for a term of office commencing on or after the date this subdivision becomes operative and before the certification of new congressional boundary lines drawn by the Citizens Redistricting Commission pursuant to subdivision (d).

(c) (1) The Attorney General has the sole legal standing to defend any action regarding a congressional district map adopted pursuant to subdivision (b).

(2) The California Supreme Court has original and exclusive jurisdiction in all proceedings in which a congressional district map adopted pursuant to subdivision (b) is challenged.

(d) The Citizens Redistricting Commission established pursuant to Section 1 shall continue to adjust the boundary lines of the congressional, State Senatorial, Assembly, and Board of Equalization districts in conformance with the standards and process set forth in Section 2 in 2031, and every 10 years thereafter as provided in Section 1.

**Fourth—** The provisions of this measure are severable. If any portion, section, subdivision, paragraph, clause, sentence, phrase, word, or application of this measure is for any reason held to be invalid by a decision of any court of competent jurisdiction, that decision shall not affect the validity of the remaining portions of this measure. The Legislature hereby declares that it would have proposed, and the voters hereby declare that they would have adopted, this measure and every portion, section, subdivision, paragraph, clause, sentence, phrase, word, and application not declared invalid or unconstitutional without regard to whether any portion of this measure or application of this measure would be subsequently declared invalid.