1    ROB BONTA
     Attorney General of California
2    ANYA M. BINSACCA
     Supervising Deputy Attorney General
3    IRAM HASAN
     DAVID GREEN
4    JENNIFER E. ROSENBERG
     Deputy Attorney General
5    State Bar No. 275496
        300 South Spring Street, Suite 1702
6     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6617
7     Fax:  (916) 731-2124
      E-mail:  Jennifer.Rosenberg@doj.ca.gov
8    *Attorneys for Defendants California Secretary of*
     *State Shirley Weber and Governor Gavin Newsom*

9                    IN THE UNITED STATES DISTRICT COURT

10                   FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                              EASTERN DIVISION

12

13

14   **STEVE HILTON,**                    8:25-cv-01988-KK-E

15                          Plaintiff,    **DEFENDANTS' OPPOSITION TO**
                                          **PLAINTIFF'S MOTION FOR**
16          v.                            **PRELIMINARY INJUNCTION**

17   **SHIRLEY WEBER, in her official**   Date:          Nov. 6, 2025
     **capacity as California Secretary of** Time:        9:30 a.m.
18   **State, GOVERNOR GAVIN**            Courtroom:     3
     **NEWSOM, in his official capacity,** Judge:        Hon. Kenly Kiya Kato
19                                        Action Filed: Sept. 3, 2025
                           Defendants,
20

21   _____

22   And the **LEGISLATURE OF**
     **CALIFORNIA**,

23                    Real Party in Interest.

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3

4

INTRODUCTION ....................................................................................1

5

BACKGROUND ....................................................................................2

6

    I.     Redistricting in California ................................................2

    II.    Prop 50 and the Ongoing Special Election ......................3

7

    III.   Plaintiff's Prop 50 Challenge .........................................5

8

LEGAL STANDARD ..............................................................................7

9

ARGUMENT ........................................................................................7

10

    I.     Plaintiff Lacks Article III Standing ..................................8

         A.    Plaintiff Cannot Show Any Injury-In-Fact ...............8

11

         B.    Plaintiff Cannot Show Causation or Redressability ................12

12

    II.    Plaintiff Has Not Raised any Serious Questions Going to the Merits ....................................................................12

13

         A.    California Voters Are Empowered to Choose Mid-Decade Redistricting Via Constitutional Amendment ...........................13

14

         B.    Plaintiff's "One Person, One Vote" Claim Fails as a Matter of Law ....................................................15

15

    III.   Plaintiff Fails to Satisfy the Remaining Preliminary Injunction Factors ....................................................................19

16

         A.    Plaintiff Cannot Establish Irreparable Harm ..........................19

17

         B.    The Public Interest and Balance of the Equities Tip Sharply in Favor of Denying Interim Relief ...........................20

18

CONCLUSION ....................................................................................22

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*All. for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)....................................................................19

*Amoco Prod. Co. v. Village of Gambell, Alaska*
    480 U.S. 531 (1987)...................................................................................20

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*
    576 U.S. 787 (2015)......................................................................................2

*Caribbean Marine Servs. Co. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988).....................................................................19

*Carney v. Adams*
    592 U.S. 53 (2020).....................................................................................12

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014)...................................................................20

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*
    98 F.4th 1180 (9th Cir. 2024).................................................................7, 13

*Food & Drug Admin. v. All. for Hippocratic Med.*
    602 U.S. 367 (2024).....................................................................................8

*Fortson v. Toombs*
    379 U.S. 621 (1965)...................................................................................22

*Gill v. Whitford*
    585 U.S. 48 (2018)..........................................................................9, 12, 15

*Gonzalez v. Automatic Emp. Credit Union*
    419 U.S. 90 (1974).....................................................................................22

*Growe v. Emison*
    507 U.S. 25 (1993).......................................................................................2

*Karcher v. Daggett*
    462 U.S. 725 (1983)...........................................................................*passim*

Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (8:25-cv-01988-KK-E)

**TABLE OF AUTHORITIES**
(continued)

Page

*League of Latin American Voters v. Perry*
    Case No. 3:21-cv-00259-DCG-JES-JVB, 2025 U.S. Dist. LEXIS
    201647 (W.D. Tex. Sept. 30, 2025) ................................................................18

*League of United Latin American Citizens v. Perry*
    548 U.S. 399 (2006)............................................................................*passim*

*Legislature v. Deukmejian*
    34 Cal. 3d 658 (1983) ..........................................................................3, 13, 14

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992)........................................................................................8

*Lydo Enters., Inc. v. City of Las Vegas*
    745 F.2d 1211 (9th Cir. 1984)......................................................................19

*Purcell v. Gonzalez*
    549 U.S. 1 (2006)....................................................................................21, 22

*Reynolds v. Sims*
    377 U.S. 533 (1964)..............................................................................7, 9, 22

*Rucho v. Common Cause*
    588 U.S. 684 (2019)............................................................................*passim*

*Sanchez v. Weber*
    No. S292592, 2025 Cal. LEXIS 5694 (Cal. Aug. 27, 2025) ..............................7

*Simon v. E. Kentucky Welfare Rts. Org.*
    426 U.S. 26 (1976)........................................................................................12

*Smiley v. Holm*
    285 U.S. 355 (1932)........................................................................................2

*Strickland v. Weber*
    No. S292490, 2025 Cal. LEXIS 5421 (Cal. Aug. 20, 2025) ..............................6

*Sw. Voter Registration Educ. Project v. Shelley*
    344 F.3d 914 (9th Cir. 2003)................................................................*passim*

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Tennant v. Jefferson County Comm'n*
    567 U.S. 758 (2012)..................................................................7, 11, 16

*Warth v. Seldin*
    422 U.S. 490 (1975)..................................................................8

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008)..................................................................7, 19

**STATUTES**

28 U.S.C. § 2284..................................................................22

Assemb. Bill 604, 2025 Cal. Stat., ch. 96..................................................*passim*

Assemb. Const. Amend. No. 8, 2025 Cal. Stat., ch. 156..............................*passim*

Sen. Bill No. 280, 2025 Cal. Stat., ch. 97..................................................4, 13

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4, cl. 1..................................................................2

U.S. Const. art. III..................................................................8

U.S. Const. amend. XIV..................................................................6, 13, 17

Cal. Const. art. XVIII, § 1..................................................................3, 14

Cal. Const. art. XVIII, § 4..................................................................3, 20

Cal. Const. art. XXI..................................................................3, 4, 13, 14

Cal. Const. art. XXI, § 1..................................................................3, 4, 14

Cal. Const. art. XXI, § 2(e)..................................................................14

**OTHER AUTHORITIES**

Cal. Leg., Assemb. Floor Analysis, AB 604 (2025-26 Reg. Sess.),
    (Aug. 21, 2025), available at https://tinyurl.com/mr4cmwcu..............................4

iv

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

3
4
5

Cal. St. Assemb. Comm. on Elections, *AB 604 Districts Atlas*,
    https://aelc.assembly.ca.gov/system/files/2025-08/ab604-
    compressed.pdf ............................................................................5, 11

6

Cal. St. Assemb. Comm. on Elections, *Proposed Congressional Map*,
    https://aelc.assembly.ca.gov/proposed-congressional-map.............................5

7
8
9

Gov. Greg Abbott (@GregAbbott_TX), X (Aug. 31, 2025, 8:23 p.m.),
    https://tinyurl.com/ ("The new Congressional Map I signed . . .
    moved the Texas G.O.P. further to the right.")....................................3

10

H.B. 4, 89th Leg., 2nd Special Sess. (Tex. 2025) ....................................3

11
12
13

Steve Hilton, *Opinion: Why I'm launching a legal war against
    California Democrats' unconstitutional power grab*, Fox News,
    Aug. 5, 2025, https://tinyurl.com/mrxpnzm4.......................................5

14
15

U.S. Census Bureau, *Guidance for Data Users: Comparing ACS Data*,
    https://tinyurl.com/4sut369n ..........................................................10

16
17
18
19
20
21
22
23
24
25
26
27
28

1

**INTRODUCTION**

2    On November 4, 2025—just fifteen days from today—California will hold a

3  Statewide Special Election.  California voters will decide whether to approve

4  Proposition 50 ("Prop 50"), a ballot measure that proposes a state constitutional

5  amendment temporarily changing how California conducts redistricting for federal

6  congressional districts.  If passed, Prop 50 would temporarily replace the

7  independent Citizens Redistricting Commission's regular decennial redistricting

8  with a new map described in Assembly Bill 604 ("AB 604") for the 2026, 2028,

9  and 2030 congressional elections.  AB 604, 2025 Cal. Stat., ch. 96.

10    Plaintiff, a single voter, asks this Court to grant a preliminary injunction to

11  immediately enjoin implementation of AB 604's proposed new map if Prop 50

12  passes.  Granting a preliminary injunction enjoining implementation of AB 604's

13  map if Prop 50 passes would cause enormous voter confusion, significantly disrupt

14  candidate campaigns, and severely impact state and local officials' preparations for

15  the 2026 Statewide Primary Election, which will begin shortly after the Secretary's

16  December 12 deadline to certify the Special Election results.  Against these

17  concrete, irreparable harms to the State, candidates, and voters statewide, Plaintiff

18  offers only meritless theories of vote dilution and *no* relevant evidence to support

19  his claims of malapportionment or any injury he will suffer in the absence of

20  interim relief.

21    Central to his preliminary injunction motion, Plaintiff claims that AB 604's

22  proposed new map will dilute every Californian's vote because it used 2020

23  decennial census data to apportion districts without accounting for intervening

24  population changes.  In Plaintiff's view, the Legislature's decision to conduct mid-

25  decade redistricting using that data was an unconstitutional "hyper-partisan

26  gerrymandering project" preventing the State from being able to justify any

27  deviations from the equal-population requirement for apportionment.  But Plaintiff

28  cannot make out an equal-population violation based on the use of the existing

1

census data in mid-decade redistricting, so the Legislature's motivations for conducting redistricting provide no basis for a vote dilution claim. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415, 420-23 (2006) (*LULAC*) (Kennedy, J.).

Moreover, Plaintiff fails to present any evidence that his vote would carry less weight than any other voter's if AB 604's map is used in future elections—to the contrary, his proposed district was drawn with *zero* deviation from the ideal equal-population size. Nor does he explain why using a new map based on 2020 census data would result in his vote carrying any less weight than it carries under the existing map drawn using the same data.

Plaintiff's legal claims fail as a matter of law. Having failed to identify any harm that would result from implementing AB 604's map, Plaintiff can establish neither standing nor the irreparable harm required for a preliminary injunction. In light of the severe harm that would result to California, candidates, and voters statewide if the Court issues a preliminary injunction barring implementation of AB 604's new map if voters approve it, Plaintiff cannot show that the balance of harms tips sharply in his favor. This Court should deny Plaintiff's demand for interim relief.

## BACKGROUND

### I. REDISTRICTING IN CALIFORNIA

The U.S. "Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts." *Growe v. Emison*, 507 U.S. 25, 34 (1993); *accord* U.S. Const. art. I, § 4, cl. 1. A state's choice of how to allocate power in redistricting "is a matter of state polity." *Smiley v. Holm*, 285 U.S. 355, 368 (1932). Among other choices, state legislatures may retain redistricting authority or assign it to independent commissions. *See, e.g., Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015).

2

California voters have the power to amend California's Constitution by approving legislatively referred constitutional amendments. *See* Cal. Const. art. XVIII, §§ 1 & 4. This power extends to amending the portion of the California Constitution—article XXI—that governs how and when California draws congressional district maps. *Legislature v. Deukmejian*, 34 Cal. 3d 658, 680 (1983). As currently written, article XXI, section 1 charges California's independent Citizens Redistricting Commission (the Commission) with redrawing congressional districts in the year following the decennial national census.

## II.   PROP 50 AND THE NOVEMBER 4, 2025 SPECIAL ELECTION

In August 2025, Texas redrew its congressional district lines mid-decade to provide Republicans a partisan advantage. *See* H.B. 4, 89th Leg., 2nd Special Sess. (Tex. 2025).[1] Several other States, including California, considered doing likewise. Days before Texas enacted H.B. 4, the California Legislature proposed a constitutional amendment to allow California to conduct mid-decade redistricting. Assembly Constitutional Amendment 8 ("ACA 8"), passed as part of the Election Rigging Response Act ("ERRA"), is a legislatively referred constitutional amendment filed with the Secretary of State on August 21, 2025. ACA 8, 2025 Cal. Stat., ch. 156.

Prop 50 is a measure that appears on the November 4, 2025 Special Election ballot and asks California voters to decide whether to adopt ACA 8. If adopted, ACA 8 would amend article XXI of the California Constitution to temporarily replace the Commission's regular decennial redistricting with a new map described in AB 604 for the 2026, 2028, and 2030 congressional elections. *See* ACA 8 § 4(b); Cal. Const. art. XVIII, §§ 1, 4.[2] Contrary to Plaintiff's assertion, ECF No. 1

---

[1] *See also* Gov. Greg Abbott (@GregAbbott_TX), X (Aug. 31, 2025, 8:23 p.m.), https://tinyurl.com/4s6vapfp ("The new Congressional Map I signed . . . moved the Texas G.O.P. further to the right.")

[2] The ERRA legislative package included ACA 8, AB 604, and Senate Bill (continued…)

("Complaint" or "Compl.") ¶8, ACA 8 would also expressly override any state
constitutional provision that would otherwise prevent use of this new map,
including article XXI, section 1's current provision setting the time for redistricting
as the year following the decennial census. *See* ACA 8 § 4(b) & (d) (providing the
new map will be used "notwithstanding any other provision of this Constitution or
existing law" until the Commission resumes redistricting responsibility in 2031).

The California Legislature described ACA 8 as an attempt "to neutralize the
partisan gerrymandering being threatened by Republican-led states without eroding
fair representation for all communities" to ensure that the "2026 United States
midterm elections for Congress" are "conducted on a level playing field[.]"  ACA
8, § 2.  The legislative history makes clear that AB 604's authors sought to draw its
temporary map "follow[ing] the principles that California voters value most in
establishing legislative districts":  (1) "maintain[ing] the geographic integrity of
even more cities than the current map adopted by the Citizens Redistricting
Commission," (2) "ensur[ing] that communities of interest remain intact—a key
principle of the constitutional amendment establishing the Citizens Redistricting
Commission—to exercise their collective voice and vote to elect officials who truly
represent them," and (3) doing so "without diluting or favoring the voting power of
any one voter over another."  *See* Cal. Leg., Assemb. Floor Analysis, AB 604
(2025-26 Reg. Sess.), at 2 (Aug. 21, 2025), available at
https://tinyurl.com/mr4cmwcu.

Before passing AB 604 and ACA 8, the Legislature provided Californians the
opportunity to submit comments and testimony in support of and opposition to the
proposals.  *Id.* at 3.[3]  The Legislature also made an interactive map publicly

---

No. 280 ("SB 280"), 2025 Cal. Stat., ch. 97.  SB 280 sets the Special Election and
outlines processes and timelines related to the Special Election and June 2026
Statewide Primary Election.

    [3] *See also* https://aelc.assembly.ca.gov/ (last visited Oct. 10, 2025).

4

available in mid-August so that voters may view their proposed districts and
detailed information regarding the number of people apportioned into each district
and any population variance between districts.[4]

Data addressing the equality of population sizes in each of the proposed
districts is publicly available on the Assembly Elections Committee's interactive
map and in its corresponding AB 604 Atlas.[5]  As shown in the AB 604 Atlas, the
ideal population count for each district proposed in AB 604—i.e., the number of
people that would achieve absolute population equality between the districts
according to data from the 2020 decennial census—would be 760,066 people.
California's population would be divided equally among districts, with a difference
in the number of people assigned to each district—a deviation from absolutely
equal population distribution—of just zero people or one person.  In other words, as
shown in the AB 604 Atlas, every single proposed district was drawn to contain
760,066, 760,065, or 760,067 people.

State and local officials have devoted significant time and resources toward
preparing for and administering the Special Election and voters have spent time
educating themselves on the issues and casting their votes.  *See* Declaration of Jana
Lean ("Lean Decl.") ¶¶ 9, 15, 16, 19, 20, 24.

### III.  PLAINTIFF'S PROP 50 CHALLENGE

In early August, Plaintiff Steve Hilton promised to file a lawsuit in federal
court to challenge what would become known as Prop 50.[6]  Thirty days later and

---

[4] Cal. St. Assemb. Comm. on Elections, *Proposed Congressional Map*,
https://aelc.assembly.ca.gov/proposed-congressional-map (last visited Oct. 10,
2025).

[5] *See* Cal. St. Assemb. Comm. on Elections, *AB 604 Districts Atlas*,
https://aelc.assembly.ca.gov/system/files/2025-08/ab604-compressed.pdf (last
visited Oct. 10, 2025) ("AB 604 Atlas").

[6] Steve Hilton, *Opinion: Why I'm launching a legal war against California
Democrats' unconstitutional power grab*, Fox News, Aug. 5, 2025,
https://tinyurl.com/mrxpnzm4.

5

1   two weeks after the Legislature approved placing Prop 50 on the ballot, Plaintiff

2   filed his Complaint, but waited three weeks before attempting to serve Defendants,

3   ECF Nos. 15, 16, 28-1 ¶¶ 2-4. A month after filing the complaint and weeks after

4   voting in the Special Election began, Plaintiff moved for a preliminary injunction,

5   ECF No. 17, waited three days to serve Defendants, ECF No. 28-1 ¶ 5, and filed an

6   ex parte application to expedite the hearing, ECF No. 27. The Court denied

7   Plaintiff's application, stating that his delay in moving for a preliminary injunction

8   "creat[ed] the purported crisis that requires ex parte relief," making ex parte relief

9   inappropriate. ECF No. 33 at 3.

10      In both his Complaint and his Memorandum (ECF No. 17-1 or "Memo."),

11   Plaintiff asserts that if Prop 50 is approved and AB 604's map is implemented,

12   congressional districts in California will be malapportioned with unequal

13   populations in violation of the "one person, one vote" principle protected by the

14   Fourteenth Amendment's equal protection guarantee, resulting in vote dilution.

15   Compl. ¶ 12; Memo. at 1. He also claims—incorrectly—that the Legislature's

16   proposal that voters approve mid-decade redistricting via ACA 8 "ignor[ed]"

17   California Supreme Court precedent, thereby diluting his vote. Compl. ¶¶ 16-22.

18   He asks the Court either to direct Secretary Weber "to suspend all activity in

19   processing this election and postpone this election"—a claim that will be moot by

20   the time of the hearing—or to preliminarily enjoin Defendants from implementing

21   Prop 50 if voters approve it. Memo. at 22. Either option would have the effect of

22   interfering with state and local officials' preparations for the 2026 Statewide

23   Primary Election, which will "begin shortly after the Secretary's December 2, 2025

24   deadline to certify the Special Election results." Lean Decl. ¶ 24.

25      In August, a handful of California state legislators filed two petitions seeking

26   similar relief directly from the California Supreme Court, making many of the same

27   arguments as Plaintiff. The California Supreme Court denied both petitions. *See*

28   *Strickland v. Weber*, No. S292490, 2025 Cal. LEXIS 5421 (Cal. Aug. 20, 2025);

6

1    *Sanchez v. Weber*, No. S292592, 2025 Cal. LEXIS 5694 (Cal. Aug. 27, 2025).

2                              **LEGAL STANDARD**

3         "A preliminary injunction is an extraordinary remedy never awarded as of

4    right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiff must

5    make "a clear showing" that he is "entitled to such relief."  *Id.* at 22.  Plaintiff urges

6    the Court to apply the Ninth Circuit's "'sliding scale' variant of the *Winter* test—

7    under which a party is entitled to a preliminary injunction if it demonstrates (1)

8    'serious questions going to the merits,' (2) 'a likelihood of irreparable injury,' (3) 'a

9    balance of hardships that tips sharply towards the plaintiff,' and (4) 'the injunction

10   is in the public interest.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,

11   98 F.4th 1180, 1190 (9th Cir. 2024) (citation omitted).  "[T]he serious questions

12   standard is 'a lesser showing than likelihood of success on the merits,'" *id.*, but

13   imposes a heavier burden on the balance of equities factor.

14        Importantly, "election cases are different from ordinary injunction cases," such

15   that "interference with impending elections is extraordinary, and interference with

16   an election after voting has begun is unprecedented." *Sw. Voter Registration Educ.*

17   *Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("*SWVREP*") (citing *Reynolds*

18   *v. Sims*, 377 U.S. 533, 585 (1964)).

19                                **ARGUMENT**

20        "[T]he constitutional test for the validity of congressional districting schemes

21   [i]s one of substantial equality of population among the various districts established

22   by a state legislature for the election of members of the Federal House of

23   Representatives." *Reynolds*, 377 U.S. at 559.  Congressional maps need not be

24   drawn with "precise mathematical equality"; a State need only "justify population

25   differences between districts that could have been avoided by a good-faith effort to

26   achieve absolute equality." *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 759

27   (2012) (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (internal quotation

28   marks omitted).  Thus, a two-prong test applies:  "[t]he parties challenging the plan

                                          7

bear the burden of proving the existence of population differences that 'could
practicably be avoided.'" *Id*. at 760 (quoting *Karcher*, 462 U.S. at 734). "If they
do so, the burden shifts to the State to 'show with some specificity' that the
population differences 'were necessary to achieve some legitimate state objective.'"
*Id*. (quoting *Karcher*, 462 U.S. at 741). Plaintiff's extraordinary request for interim
relief must be denied because his vote dilution theories fail as a matter of law and
he lacks standing to bring them in the first place.

## I. PLAINTIFF LACKS ARTICLE III STANDING

"Article III of the Constitution confines the jurisdiction of federal courts to
'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367, 378 (2024). An "essential" part of Article III's case-or-controversy
requirement "is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S.
555, 560 (1992). To establish standing, "a plaintiff must demonstrate (i) that she
has suffered or likely will suffer an injury in fact, (ii) that the injury likely was
caused or will be caused by the defendant, and (iii) that the injury likely would be
redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at
380. Plaintiff cannot establish any of these three elements.

### A. Plaintiff Cannot Show Any Injury-In-Fact

Plaintiff must allege an injury that is "actual or imminent, not speculative—
meaning that the injury must have already occurred or be likely to occur soon." *All.
for Hippocratic Med.*, 602 U.S. at 381. This injury must "be 'concrete,' meaning
that it must be real and not abstract." *Id*. It also must be "particularized," that is, it
"must affect 'the plaintiff in a personal and individual way' and not be a
generalized grievance." *Id*. Because Plaintiff seeks prospective relief, he "must
establish a sufficient likelihood of future injury." *Id*.

Plaintiff cannot show he will imminently suffer an injury sufficient to
challenge proposed congressional district lines statewide. He alleges that he resides
in *a* congressional district in California—District 15—and then attempts to

8

challenge the proposed map for *all* congressional districts in California, arguing
that redistricting under Prop 50 could result in the dilution of his vote and the votes
of others.  Compl. ¶¶ 11, 22; Memo. at 20.  But Plaintiff cannot "attempt to raise
putative rights" of other voters to support his claim of entitlement to relief.  *Warth
v. Seldin*, 422 U.S. 490, 509, 514 (1975). Nor can he claim statewide relief.  When
the "alleged harm is the dilution of [an individual's] votes, that injury is district
specific" and any remedy "lies in the revision of the boundaries of the individual's
own district." *Gill v. Whitford*, 585 U.S. 48, 66 (2018).  Plaintiff's statewide
objection is "only a generalized grievance against governmental conduct" and is
inadequate to support standing.  *Id.*

Plaintiff, moreover, has not established any injury sufficient to challenge
redistricting in his own district.  He suggests that because some people have moved,
died, or been born since the last census, the population of his district might have
changed.  Memo. at 17-18.  He then argues that if Prop 50 is passed and
implemented, the resulting malapportionment "will dilute every California[n]'s
voting power by creating congressional districts that do not comply with the 'one-
person, one-vote' principle because they are not comprised of roughly equal
population based on any accurate and current data."  Memo. at 20.

Plaintiff misunderstands malapportionment and what such claims require to
establish standing.  Malapportionment involves the unequal distribution of people
across district lines, resulting in citizens in less-populated districts having votes that
carry more weight than citizens in more-populated districts.  *See Reynolds*, 377
U.S. at 562-63.  By definition, malapportionment cannot "dilute every
California[n]'s voting power."  Memo. at 20.  Rather it results in some voters
having the weight of their votes diluted while the weight of others' votes is
enhanced.  *Elec. Integrity Proj. Cal., Inc. v. Weber*, 113 F.4th 1072, 1087 (9th Cir.
2024).  Plaintiff provides no evidence supporting even a bare inference that his vote
would be diluted if AB 604's map is adopted.  Nor does he provide any information

9

1  to compare the current congressional map for his district to the proposed

2  congressional map under Prop 50.

3      The only "evidence" Plaintiff proffers is a barebones declaration from

4  consultant Chandra Sharma, who offers generalized thoughts and no district-

5  specific data or analysis.  ECF No. 17-2.  Even if the Court credits that declaration

6  for the little it says, and even if Plaintiff is correct that population fluctuations since

7  2020 were so significant that the Legislature was legally obliged to consider them

8  (he is not, *see infra* Argument § II.B.), Sharma's declaration actually supports the

9  conclusion that Plaintiff's vote likely would *not* be diluted:  If, as Mr. Sharma

10  asserts, ECF No. 17-2 at 3, San Francisco's population decreased since the 2020

11  census, then Plaintiff and other voters remaining in District 15—which

12  encompasses parts of San Francisco—are more likely to have their votes weigh

13  *more* in congressional elections under AB 604's proposed map than voters living in

14  districts where populations increased.[7]

15      In any case, the Legislature was under no constitutional obligation to use any

16  population data other than the latest official census data in crafting AB 604's

17  proposed map.  *See infra* Argument § II.B.; *LULAC*, 548 U.S. at 415, 420-23

18  (Kennedy, J.).  And Plaintiff cannot establish that any dilution of his vote would

19  occur under the proposed District 15 map drawn using official 2020 census data.

20  Plaintiff could have, but did not, provide the Court with a copy of the proposed

21  District 15 map (or even a copy of the current District 15 map).  As discussed

22  above, the ideal population size for each proposed district under AB 604 is 760,066

23        [7] Mr. Sharma's conclusory declaration references American Community

24  Survey data from 2024 to draw conclusions about population shifts.  ECF No. 17-2

25  at 3.  But "all ACS data are estimates" based on data collected "from a sample of
the population in the United States and Puerto Rico," and the Census Bureau

26  advises data users to "use ACS to obtain population characteristics" rather than
population totals, and "numbers from the [latest] Census to obtain counts of the

27  population."  U.S. Census Bureau, *Guidance for Data Users: Comparing ACS

28  Data*, https://tinyurl.com/4sut369n (last visited Oct. 10, 2025).

people.  *See supra* Background § II; AB 604 Atlas.  If Prop 50 is approved, District 15 will be drawn to contain 760,066 people—*zero* deviation from the ideal, absolutely equal population count, as shown in the excerpt below.  *See* AB 604 Atlas at 22.

Because Plaintiff's district would not deviate from the ideal population size at all if voters approved Prop 50, he cannot meet his burden to establish at the threshold "the existence of population differences that 'could practicably be avoided.'"  *Tennant*, 567 U.S. at 760 (quoting *Karcher*, 462 U.S. at 734).  Thus, he

## District 15



| Population | Deviation | Deviation % | Other | Other % | Latino | Latino % | Asian | Asian % | Black | Black % |
|---|---|---|---|---|---|---|---|---|---|---|
| 760,066 | 0 | 0.0% | 267,088 | 35.1% | 201,867 | 26.6% | 271,935 | 35.8% | 19,176 | 2.5% |

| Total CVAP | Other CVAP | Other CVAP % | Latino CVAP | Latino CVAP % | Asian CVAP | Asian CVAP % | Black CVAP | Black CVAP % |
|---|---|---|---|---|---|---|---|---|
| 490,568 | 183,124 | 37.3% | 101,204 | 20.6% | 188,931 | 38.5% | 17,309 | 3.5% |

Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (8:25-cv-01988-KK-E)

1    cannot identify any injury sufficient to establish standing. [8]

2    **B.    Plaintiff Cannot Show Causation or Redressability**

3    Plaintiff also must show that his alleged injury "fairly can be traced to the

4    challenged action of the defendant[.]"  *Simon v. E. Kentucky Welfare Rts. Org.*, 426

5    U.S. 26, 41-42 (1976).  And he must show that a favorable judicial decision likely

6    would redress his alleged injury.  *Carney v. Adams*, 592 U.S. 53, 58 (2020).

7    Plaintiff can show neither.  Plaintiff's claimed injury is premised on the use of 2020

8    census data and his contention that this data does not reflect current population

9    distributions.  Memo. at 13; ECF 1 at ¶11.  But whether or not voters approve Prop

10   50, congressional districts will still be based on 2020 census data, because the

11   existing congressional district map was drawn using this very data.  Any alleged

12   injury from the use of 2020 census data cannot fairly be traced to the Legislature's

13   decision to refer Prop 50 to the voters or the use of AB 604's map if voters approve

14   it.  As a result, Plaintiff's claimed injury would remain unredressed.

15   **II.    PLAINTIFF HAS NOT RAISED ANY SERIOUS QUESTIONS GOING TO THE
         MERITS**

16

17   Plaintiff cannot demonstrate that the balance of equities tips sharply in his

18   favor, *see infra* Argument § III(B), so he is subject to the more onerous burden to

19   show likelihood of success on the merits.  Nonetheless, even if the "serious

_____

20   [8] Plaintiff also misses the mark to the extent he seeks to establish standing on
     the theory that his "statewide campaign [for California governor] will touch every

21   Congressional district."  Compl. ¶ 13.  Congressional district maps have no bearing

22   on elections for statewide office.  Nor does the purportedly "hyper-partisan" nature
     of the proposed redistricting provide Plaintiff a basis to assert rights of people he

23   hopes will be his constituents in order to bolster his claim of individual standing.

24   *Id.* ¶ 13.  The Supreme Court has been clear:  partisan gerrymandering claims are
     nonjusticiable.  *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019).  And the Court

25   in *Gill v. Whitford*, 585 U.S. 48 (2018), which Plaintiff cites to support his

26   argument that he would be injured by the "wast[ing]" of his vote, Memo. at 18,
     cautioned that establishing injury in fact "[t]urns on effect, not intent," 585 U.S. at

27   70.  Plaintiff cannot establish standing on his vote dilution claims without showing

28   that his vote will be worth less than voters in other districts.

                                          12

questions" sliding scale test applies, Plaintiff must still show that his claims "involve a fair chance of success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1192 (internal quotation marks and citations omitted). Plaintiff cannot meet even this lowered bar, as his claims fail as a matter of law.

### A. California Voters Are Empowered to Choose Mid-Decade Redistricting Via Constitutional Amendment

Plaintiff's claim that the Legislature's passage of ACA 8, AB 604, and SB 280 and placement of Prop 50 on the ballot somehow will result in malapportionment that violates his right to equal protection under the Fourteenth Amendment, Compl. ¶¶16-22, appears to be nothing more than a partisan gerrymandering claim based solely on a purported violation of California state law. That claim necessarily fails, as the Supreme Court in *Rucho* stated unequivocally that "partisan gerrymandering claims present political questions beyond the reach of the federal courts." 588 U.S. at 718.

Moreover, Plaintiff is wrong that the Legislature "ignore[d] the California Supreme Court's decision in *Deukmejian*," Compl. ¶ 21, when it referred ACA 8's proposal for mid-decade redistricting to the voters and placed Prop 50 on the ballot.[9] Nothing in California law prohibits California voters from choosing to change the manner or time in which the State redistricts so long as they do so by way of a constitutional amendment. In interpreting the predecessor to today's article XXI, which provided for decennial redistricting by the Legislature, the California Supreme Court unequivocally stated that "[t]he people of [California], as the ultimate source of legitimate political power, are of course free through *constitutional amendment* to adopt whatever changes in the existing system they consider appropriate, subject only to limitations contained in the Constitution of the United States." *Deukmejian*, 34 Cal. 3d at 680 (emphasis added). The Court also held that mid-cycle congressional redistricting via "the people's reserved power of

---

[9] Perhaps realizing this claim lacks merit, Plaintiff never cites *Deukmejian* in his motion for a preliminary injunction.

[statutory] initiative" was not permitted under the then-existing article XXI. *Id.* at 663, 674-75. However, Prop 50 proposes that voters adopt a constitutional amendment authorizing mid-cycle redistricting, which the California Supreme Court expressly held was permissible in *Deukmejian*. *Id.* at 680.

Because a legislatively referred constitutional amendment has no effect unless and until a majority of California voters approve it, ACA 8 will not be adopted, and no redistricting will occur, if the voters do not approve Prop 50. Providing for a statewide special election on whether to amend the California Constitution and officially adopt the map proposed in AB 604 is squarely within the Legislature's authority under the California Constitution. Cal. Const. art. XVIII, § 1.

Moreover, the fact that the *current* version of the California Constitution prescribes decennial, nonpartisan redistricting by the Commission, *see* Cal. Const. art. XXI, §§ 1, 2(e), does not restrain the California electorate's ability to adopt via constitutional amendment a new congressional map mid-decade that takes partisan or political considerations into account. The text of ACA 8, if adopted by voters, would expressly amend article XXI of the California Constitution to provide for the temporary alternative redistricting procedure "notwithstanding any other provision of this Constitution or existing law." ACA 8 § 4(b).

Neither does anything in the federal constitution prohibit California voters from adopting a new redistricting map mid-decade that was developed with some partisan considerations in mind. In rejecting the argument that partisan gerrymandering may provide a viable basis for a justiciable equal protection claim, the Supreme Court in *Rucho* acknowledged that "[t]o hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities." *Rucho*, 588 U.S. at 701; *see also id.* at 700-01 ("while it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, 'a jurisdiction may engage in constitutional political gerrymandering'"

14

1  (citation omitted)).[10]

2  **B.    Plaintiff's "One Person, One Vote" Claim Fails as a Matter of
3           Law**

4          Plaintiff claims that AB 604's proposed congressional map, if adopted, will

5  violate the one-person, one-vote principle because it was drawn using the 2020

6  decennial census data—the same data the Commission used to draw the current

7  map—without accounting for intervening population changes.  Compl. ¶¶ 11-15.

8  Plaintiff asserts that the use of 2020 census data evidences the Legislature's failure

9  to make a good-faith effort to achieve mathematical equality in apportioning

10 districts "in favor of intentionally disadvantaging political opponents and diluting

11 voting power of Californians who reside in every district across the State."  Memo.

12 at 14.

13          This theory of vote dilution fails as a matter of law, as there is no

14 constitutional infirmity in the Legislature's reliance on the last decennial census

15 data in drawing AB 604's proposed map or in its decision to redistrict mid-decade.

16 If there were, then California's existing congressional map—and that of every state

17 in the country—necessarily must also violate the one-person, one-vote principle.

18 And because use of the 2020 census data is the *only* basis Plaintiff offers for his

19 malapportionment theory, Plaintiff does not and cannot raise any serious question

20 warranting a preliminary injunction.

21          As an initial matter, Plaintiff asks the Court to subject Defendants to a legal

22 standard and evidentiary burden that do not apply in one-person, one-vote cases.

23 Without citing a single case in support, Plaintiff argues that Defendants must show

24 by "clear and convincing evidence that [the districts described in AB 604] are

25 relatively equal in population or if unequal, that the discrepancy serves a legitimate

26          [10] Plaintiff's reliance on *Gill* to support any argument that the Court may find
27 an equal protection violation based solely on a state's consideration of partisan
    matters in redistricting is misplaced, as *Gill* was decided before *Rucho*
28 unequivocally confirmed that partisan gerrymandering claims are nonjusticiable.

15

1    governmental purpose." Memo. at 16; *see also* Memo. at 14, 19-22; ECF No. 17 at

2    2. Plaintiff cites pre-*Rucho* caselaw in an apparent attempt to suggest that *any* maps

3    drawn mid-decade with partisan considerations in mind must be presumed to lack

4    legitimate justifications because they do not reflect an "'honest and good faith

5    effort' to [] fashion roughly equal population within congressional districts."

6    Memo. at 15.

7         This is not the applicable standard. It is the "[p]arties challenging

8    apportionment legislation [who] must bear the burden of proof on this issue."

9    *Karcher*, 462 U.S. at 730-31. The burden shifts to Defendants to "show with some

10   specificity" that the population differences "were necessary to achieve some

11   legitimate state objective" *only* if Plaintiff meets his threshold "burden of proving

12   the existence of population differences that 'could practicably be avoided.'"

13   *Tennant*, 567 U.S. at 760. This, Plaintiff cannot do. Nor has he attempted to do so,

14   failing even to provide any evidence allowing this Court to compare the current

15   map with the proposed map.

16        The Supreme Court's ruling in *LULAC*, which involved a nearly identical

17   theory of malapportionment, compels rejecting Plaintiff's claim. Like Plaintiff, the

18   *LULAC* plaintiff theorized that voluntary "mid-decade redistricting for exclusively

19   partisan purposes" using the latest decennial census data "violates the one-person,

20   one-vote requirement" by unnecessarily creating "unlawful interdistrict population

21   variances" based on unaccounted for shifts in population. 548 U.S. at 420-21. The

22   *LULAC* plaintiff further argued that the state could not offer any legitimate

23   justification to overcome the fact that the map was drawn, and population variances

24   created, as "the product of partisan bias and the desire to eliminate all competitive

25   districts." *Id.* at 422.

26        Though the Court's decision in the case was fractured, Justice Kennedy,

27   writing for three justices, rejected the *LULAC* plaintiff's theory, and two additional

28   justices concurred in the result. *See id.* at 421-24 (Kennedy, J.); *id.* at 492-93

(Roberts, C.J. concurring in part, concurring in the judgment in part, and dissenting in part). Justice Kennedy first wrote that "the Constitution and Congress state no explicit prohibition" on "mid-decade redistricting to change districts drawn earlier in conformance with a decennial census[.]" *Id.* at 415. He explained that "States operate under the legal fiction that their plans are constitutionally apportioned throughout the decade," and under that legal fiction, decennial redistricting plans are not considered unconstitutional "three or five years into the decade if the State's population ha[s] shifted substantially." *Id*. at 421.

Justice Kennedy further rejected the *LULAC* plaintiff's attempt to subject voluntary mid-decade redistricting plans drawn with partisan motivations to an irrebuttable presumption of unconstitutionality where they rely on existing census data that might give rise to population variance. *Id.* at 421-22. In doing so, he reasoned that the plaintiff's proffered standard turned "on the justification for redrawing a plan in the first place[,]" rather than "whether a redistricting furthers equal-population principles[.]" *Id.* at 422. Accordingly, Justice Kennedy concluded that the plaintiff's theory did not give rise to a viable vote dilution claim or provide a reason to disregard the "legal fiction" that a map based on decennial census data is lawfully apportioned. *Id.* at 422-23; *accord id.* at 492-93 (Roberts, C.J., concurring in the conclusion that the plaintiff's vote dilution theory regarding mid-decade redistricting using decennial census data did not provide any reliable standard for identifying an unconstitutional political gerrymander). And because the *LULAC* plaintiff, like Plaintiff here, could not establish an equal-population violation based on the use of the existing census data, "examination of the legislature's motivations" was "[ir]relevant." *Id.* at 422-23.

No justice dissented from Justice Kennedy's conclusion that states may redistrict mid-decade using existing decennial census data rather than updated population data, even if the redistricting was motivated by partisan considerations, without running afoul of the Fourteenth Amendment. *Cf. id.* at 455 (Stevens, J.,

17

1    joined by Breyer, J., dissenting) (stating that the district court "correctly found that

2    the Constitution does not prohibit a state legislature from redrawing congressional

3    districts in the middle of a census cycle").

4        Just twenty days ago, a district court in Texas entertaining identical arguments

5    to those Plaintiff makes here rejected a challenge to Texas's use of 2020 census

6    data in conducting its mid-decade redistricting for partisan gerrymandering

7    purposes.  *See League of Latin American Voters v. Perry*, Case No. 3:21-cv-00259-

8    DCG-JES-JVB, 2025 U.S. Dist. LEXIS 201647 (W.D. Tex. Sept. 30, 2025)

9    (*Perry*).  That district court adopted Justice Kennedy's reasoning, explaining that,

10   as in *LULAC*, "[i]f, due to the 'legal fiction' that maps based on the most recent

11   census data remain lawfully apportioned until the next decennial census, post-

12   census population shifts didn't render the maps in *LULAC* unconstitutional, then

13   post-census population shifts don't render Texas's 2025 congressional maps

14   unlawful either."  *Id.* at *19-20.

15       So, too, here.  This Court should follow *LULAC*.  As the *Perry* court

16   emphasized, "no court has ever invalidated a [mid-decade] congressional

17   redistricting plan" on the basis that the districts were drawn based on the latest

18   decennial census data.  *Id.* at *22.  And the Supreme Court has emphasized that

19   census data provides a reliable "basis for good-faith attempts to achieve population

20   equality."  *Karcher*, 462 U.S. at 726.

21       Finally, under AB 604's map—permissibly drawn mid-decade using the 2020

22   census data, *see LULAC*, 548 U.S. at 415, 421-24—Plaintiff's district would not

23   deviate from the ideal population target by even one person.  *See supra* Argument §

24   I.A.  The proposed district in which Plaintiff claims to reside thus meets the

25   standard his own consultant posits—that the "baseline is a deviation of no more

26   than +/- 1 individual per district."  ECF No. 17-2 at 2.  Because Plaintiff failed

27   entirely to identify any deviation from the ideal district apportionment, "the

28

18

apportionment scheme must be upheld" and Plaintiff's improper attempt to shift his burden to Defendants must be rejected.  *Karcher*, 462 U.S. at 731.

### III.    PLAINTIFF FAILS TO SATISFY THE REMAINING PRELIMINARY INJUNCTION FACTORS

As Plaintiff asserts entitlement to a preliminary injunction based on "serious questions" rather than likelihood of success on the merits, he faces a much heavier burden on the remaining factors.  He must show not only likelihood of irreparable harm, but also that the balance of hardships "tips sharply in [his] favor."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  This is a bar he cannot reach.  *SWVREP*, 344 F.3d at 919.

### A.    Plaintiff Cannot Establish Irreparable Harm

Plaintiff cannot show that "he is likely to suffer irreparable harm in the absence of" a preliminary injunction.  *Winter*, 555 U.S. at 20 (2008).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  As discussed above, Plaintiff has not identified *any* equal protection injury that would flow from the passage of Prop 50 and use of AB 604's proposed map.  *See supra* Argument §§ I.A., II.B.  This failure is fatal to his motion.

Further, to the extent Plaintiff seeks an expedited order granting pre-election relief, his own failure to move expeditiously to secure a temporary restraining order or preliminary injunction in advance of the Special Election belies any contention that he would be irreparably harmed without one—especially since Plaintiff announced his intention to challenge the Special Election two full months before he filed his motion.  "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action[.]"  *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (citations omitted).

19

**B.    The Public Interest and Balance of the Equities Tip Sharply in Favor of Denying Interim Relief**

As to the remaining factors, Plaintiff fails to establish that the balance of the equities tips in his favor at all, much less *sharply* so.  The Court must weigh the competing claims of injury by evaluating "the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542 (1987).  The balance of harms and public interest factors merge since the government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Issuing an injunction indefinitely barring California from implementing Prop 50, if voters approve it, would be tantamount to denying Californians a state constitutional right.  Cal. Const. Art. XVIII, § 4 (giving voters power to amend the state constitution by approving legislatively referred constitutional amendments).  And interim relief is particularly fraught with the election well underway, as voters have been voting for weeks.  Lean Decl. ¶ 15; *SWVREP*, 344 F.3d at 919 (federal court "interference with an election after voting has begun is unprecedented").  An injunction would also cause enormous confusion, especially if the duration of the order is unclear.  Lean Decl. ¶ 18.  For example, voters and candidates would be unsure if the previous map applies for the June 2, 2026 Statewide Direct Primary Election.  *Id*.  And if the order lifted in the midst of the June 2026 Primary Election, the result would be chaotic.  *Id*.  State and local election officials would need make a monumental effort to ensure congressional districts and voter precincts are updated, determine how to treat votes that had already been cast based on the previous districts, and determine how to communicate the updates for voters.  *Id*.  Similarly, candidates would need to reevaluate their entire campaigns and duplicate efforts to ensure they run in the correct district.  *Id*.  The closer in time such a change occurs to the June 2026 Primary election, the more confusion and wasted efforts and resources would result.  *Id*.

20

"These investments of time, money, and the exercise of citizenship rights cannot be returned," and simply lifting the injunction would not restore the integrity of California's electoral system. *SWVREP*, 344 F.3d at 919; Lean Decl. ¶ 21. Any delays in implementing Prop 50 if voters approve it would disrupt the June 2026 Primary Election, as candidates must know which districts in which they should file and campaign so they may begin collecting signatures by mid-December. *Id.* ¶ 24.a.

Against these concrete irreparable harms to California, its people, and their right to self-govern, Plaintiff alleges only a speculative future harm unsupported by any evidence, claiming that if voters approve Prop 50 and congressional districts are redrawn, then the weight of his vote might be diluted in future congressional elections. Memo. at 20. Plaintiff asserts that "Defendants would suffer no harm other than the loss of time and effort to attempt to produce" evidence (on a standard that does not apply to them in malapportionment claims). *Id.*; *see supra* Argument § II.B. But "hardship falls not only upon the putative defendant," but also "on all citizens of California, because this case concerns a statewide election." *SWVREP*, 344 F.3d 919. Plaintiff's baseless claims cannot justify preventing the exercise of the people's franchise, confusing and frustrating voters, and severely disrupting the electoral process in California. *See id.* at 918 (affirming decision denying an injunction request that would effectively halt an ongoing election); Lean Decl. ¶¶ 21, 25.

Finally, Plaintiff cannot salvage his request by misapplying a string of inapposite cases. Fatal to his argument that the *Purcell* principle authorizes this Court to grant interim relief, Plaintiff concedes that his injunction request "does not involve any change to the actual elections process within California." Memo. at 9; *see Purcell v. Gonzalez*, 549 U.S. 1, *4-6 (2006) (addressing timing of changing election rules and procedures). Rather, this case involves Plaintiff's demand that the Court *halt altogether* an ongoing Special Election where the "State's election

21

machinery is already in progress," *Reynolds*, 377 U.S. at 585, to prevent all California voters from voting on a measure with which he disagrees.[11]  This is not a challenge to election-related procedures that "do not necessarily result in the turning away of qualified, registered voters by election officials[.]"  *Purcell*, 549 U.S. at *2.[12, 13]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for preliminary injunction in its entirety.

---

[11] Although the Court will hear Plaintiff's motion two days after the Special Election, the results will not be certified until December 12, 2025.  Lean Decl. ¶ 24.

[12] For this reason, Plaintiff's other authorities addressing election rules do not support his case.  *See* Memo. at 9-11.  And *Fortson*, which challenged a legislative referral of a constitutional amendment by a malapportioned legislature, is plainly inapposite here.  *Fortson v. Toombs*, 379 U.S. 621 (1965).  Plaintiff does not challenge the composition of California's Legislature and expressly disclaimed any challenge to California legislators' authority to propose constitutional amendments for voter approval.  Memo. at 10.

[13] Plaintiff requests a three-judge panel under 28 U.S.C. § 2284.  Memo. at 2.  However, the Court need not refer this case for assignment to a three-judge panel.  Plaintiff's lack of standing is one "ground upon which a single judge [can] decline[] to convene a three-judge court[.]"  *Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90, 100 (1974).  Plaintiff's raising of claims that are "constitutionally insubstantial" is another ground.  *Goosby v. Osser*, 409 U.S. 512, 518 (1973).  Defendants will submit additional briefing addressing this topic, as raised in the Court's October 20, 2025 order (ECF No. 37).

22

1  Dated:  October 20, 2025

2                                                    Respectfully submitted,

   ROB BONTA
3  Attorney General of California
   ANYA M. BINSACCA
   Supervising Deputy Attorney General
4  IRAM HASAN
   DAVID GREEN
5  Deputy Attorneys General

6

7                                                    */s/ Jennifer E. Rosenberg*
   JENNIFER E. ROSENBERG
8  Deputy Attorney General
   *Attorneys for Defendants California*
9  *Secretary of State Shirley Weber and*
   *Governor Gavin Newsom*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         23

1

**CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for Defendants California Secretary of

3   State Shirley Weber and Governor Gavin Newsom, certifies that this brief contains

4   6,876 words, which complies with the word limit of L.R. 11-6.1.

5

6   Dated:  October 20, 2025                    Respectfully submitted,

7                                               ROB BONTA
                                                Attorney General of California
8

9

10                                              */s/ Jennifer E. Rosenberg*
                                                JENNIFER E. ROSENBERG
11                                              Deputy Attorney General
                                                *Attorneys for Defendants California*
12                                              *Secretary of State Shirley Weber and*
                                                *Governor Gavin Newsom*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24